Good morning, your honors. If it pleases the court, I'm Blake Hendricks. I'm here to present an oral argument on behalf of Appellant Watson. Watson was convicted following, I think it was a two-day jury trial, of distributing more than five grams of methamphetamine. Simple fact, it was a single transaction alleged to have occurred on August 29, 2014. And the trial testimony was straightforward. It was a confidential informant by the confidential informant testified that he set up a transaction with Watson on that date, August 29, 2014, and bought 36 grams of methamphetamine actual from him. The remaining part of the government's case was basically the drug task force officers who attempted to corroborate the confidential informant's testimony through some surveillance, physical surveillance, and some audiovisual recordings. The jury convicted Watson, and the judge varied upward to 180 months from a guideline range of 120 to 137 months. Issues on appeal. Principally, the introduction of other crimes evidence comes about in three instances. Was the evidence sufficient to convict Watson? Did the trial testimony fatally vary from the discovery that Watson was provided? And then finally, was there procedural error in the sentencing mechanism, and was that sentence ultimately substantively reasonable? The other crimes evidence issue. As I said, it comes about in three instances I read in the transcript. And the first instance of the other crimes evidence was an officer was allowed to testify that Watson was a target of this federal state investigation going on in northeast Arkansas. The specific evidence that was allowed was that Watson had tortured someone by taking the end of a knife, heating it up, and burning this person's thighs. Other evidence that was allowed were acts of domestic violence, that he had beaten women and children. And then a third occasion was that he had physically assaulted an officer in an altercation. But the trial judge's initial ruling was favorable to the defense, but there was a warning that if you open this up, I'm going to let the government rebut, if you will. And it caused me, what was the targeting defense? Was it just an attempt at jury nullification? How could targeting be a, why did they open it up? I don't know if you tried the case, it doesn't matter. No, no, I didn't try the case and actually just got on a week ago to come in and orally argue it. And I say that because it's allowed me to take a fresh look at a case that I didn't know anything about. Yeah, I asked the same question. So the theory was this, and it was litigated pretrial, is Watson, can I bring in the fact that I had sued these same officers and that's their motivation for targeting me and bringing me into this case? And Judge Miller said, I hear that theory, but be careful, because if you do it, I may allow other evidence in, really what their position is of why you were targeted. Did he represent himself at trial? He did not. But this was his, I mean, it was the client's urging or decision. That was my reading of the transcript, yes. This is where the client wanted this case to go. But here's interestingly what happened. So it raises the issue of opening the door. I can't see that this, I mean, this is a single drug transaction case. Now you've got evidence that this guy is a torturer and cruel and inhumane. We've gone way beyond the scope of the charged conduct. Was there any discussion with the trial court about that? I think the court was trying to limit. I thought my review of it was the government wanted even more than what was presented. But was there any discussion about, hey, can we keep away some of the violent acts? I know that this investigator, or I guess the task force, was out looking for violent, quote, unquote, folks. Was there some discussion of saying, look, can we downplay that and have some other way of presenting this idea that you were on a list for another reason or related reason? I think so. The way that I read that pretrial portion of the transcript was the judge was going, I'm going to allow you, government, to get in now that this cat's out of the bag. I'm going to allow you to get into some. But I didn't see that there was sort of a disciplined approach to it. How about objections as it came in along these lines? I think that there were, actually. I may be wrong. So that would be the colloquy that would test. Answer or not answer Judge Kelly's question. There was clearly a pretrial discussion of it. Counsel and Watson were warned something was going to come in. But then there was a list of 31 examples that were given. Three of those were chosen by the government to come in, and they were particularly harsh. They were particularly the three most prejudicial types of conduct. Now, here's my position, is that, yes, this door was opened. But as I read the transcript, the government, to stay with that bad metaphor, they knocked first. Read the testimony of the first officer. I think it's Frazier. And within the first couple of pages of his trial testimony, the government's asking him about what's this investigation about. And it says, we're targeting repeat violent offenders. So the cat's out of the bag initially in the government's direct testimony. Was that objected to? No, it was not objected to. And I gather, I mean, I'm speculating. I have no idea what was in trial counsel's mind. Well, to some extent it's intrinsic to why was there a controlled by. So. I understand what you're saying. I would think the defense has to be a ready policeman on this sort of, really it's a 403 type problem. Should there have been an objection at that point? It may have been tactical on defense counsel's part. Look, there, they raised it. Now I get to give my explanation of why Watson was targeted, and it was because he had sued these people and just won, I think, won a settlement against him right after this trial, or right after the transaction, I think. But my position is, yeah, the government actually was knocking on that door, and this was just the response that Watson gave. Assuming that I'm, assume I'm incorrect on that. Then the question becomes, well, was the door opened that wide? Was it opened wide enough to allow this just really loathsome sort of evidence, evidence that is incredibly damaging to Watson? Again, when we're looking at this as this is just a single drug transaction case, and now you're talking about knives and torture and all that. And I submit to you, no, that the door was not that wide open when evidence of, I got targeted because I sued you guys. I haven't read the cases cited in your briefs. Do any of them address this issue sort of generically, you can't open the door too wide? I mean, there's generic case law on it, and, of course, there's no rule of evidence called opening the door. Any case that would illustrate a court's reaction to what's too wide? I don't think so. Okay. And, again, I guess it's a matter, it's really just relevance. It's just how important was that evidence to the government's case? How damaging or prejudicial was it to Watson? How much influence did it have on the jury? And when you take it in the context of this case, again, it didn't seem to me to be a difficult case. It didn't seem to me to be the world's greatest case for the government. You've got a bit of a rogue CI. It comes down to the CI and nothing more than attempts by officers to corroborate this. You've got a bit of a rogue CI, a guy that's made over $100,000 doing this, as I gather, sort of a profession and a career. There are times during these transactions, the two, I'm talking about what he was charged and convicted of, and then a subsequent transaction that came in, I suppose, under Rule 404B. I think the government argues it's intrinsic evidence. But there are times during those transactions where he was lost, he was unmonitored. The audiovisual equipment, I think, is off by a couple of days. It's not the world's greatest, neatest, most efficient case for the government. But you bring in this sort of awful evidence, and it seems to me a conviction was a foregone conclusion once that jury heard, this guy was taking a knife and torturing people with it and assaulting officers. That leads then, so you have the opening the door argument on that really terrible sort of evidence. Then the second other crime's evidence is, was a transaction that occurred three weeks later, in which I think Epsom salt was ultimately sold to the CI, was that evidence admissible? And again, Watson's submission is that it's not. The government's position is that's intrinsic evidence. It's not even 404B. It's part of the story. That seems implausible to me, that the complete the story part of intrinsic evidence. Is it necessary? Is it needed? Is it essential to complete the story of the charged transaction? And McCormick looked at it in, I think, three different ways. If you leave it out, this uncharged conduct, does it leave the jury guessing? I don't get this whole story. Do they have to fill in the blanks, so to speak? Would it be admissible under 404B, though? Let's say we accept your argument that it's not intrinsic. It doesn't complete the story. Would it still be all right under the rule? I don't see which exception it would fit in under the, I guess there are nine under 404B. First of all, it's subsequent conduct. So it's not going to go to his preparation for the August 29th charged transaction, his plan to do it. The government's position in its brief is simply, it's similar in kind and close in time. I mean, I think that's debatable. It's three weeks, and it's subsequent. But let's assume that it is close in time and similar in kind. It's still, they fail to identify any specific reason other than the similarity of what makes it admissible. There are cases cited in there as, well, it's intrinsic evidence because it helps explain the relationship to the parties. Or, again, it helps to show the complete picture. Well, the charged conduct had been completed three weeks before, so there was no necessity to complete the story. And it doesn't explain the relationship between the parties. They didn't know each other. This was a CI acting out there. So I don't see how the subsequent transaction was either admissible as an exception to the no character evidence rule or as intrinsic evidence. On the intrinsic issue, it strikes me that the course of conduct, even though this is subsequent, probably the government would believe that it helps corroborate with the rogue CI, his credibility. If that's a rational or probative inference, doesn't that address the, isn't that relevant to the intrinsic question? I'm not sure whether impeachment or credibility is typically considered the intrinsic question. You know, I don't know. I look at intrinsic evidence as, does it, again, complete the story? And that completion of the story is what led up to what you got charged with. And, again, this is what happened afterwards. The story, it just doesn't seem necessary to me to tell the story. But here the story was, as I understand from the briefs, the informant comes back and says, he's willing to sell more. And then it's a, it's all ebbs and flows. Okay, we'll set up another buy, and the buy actually goes forward, only it turns out to be counterfeit drugs. So you can't prosecute it as typical contraband. And so, I mean, it sort of completes the rogue CI story, if not the drug transaction story. That seems to me to be a decent intrinsic theory. But I don't know if the cases would support it. And our submission is that the story was complete on August 29th. Now, but there is a second layer to that that's sort of interesting, is that part of that September 19th transaction, uncharged, also involved the defendant's brother robbing the CI. And that came in. And I see that as actually, I don't think it's addressed separately in the brief, but it occurred to me that that's a separate, another other crimes evidence instance that's come in that should be analyzed. Because that did nothing but, again, serve to prejudice the defendants. Not only are you bad guy and a torturer and cruel, but your family is, too. And so that whole issue, I'm out of time, but. Mr. Hendricks, if I can. I gather you didn't write the briefs, right? I did not. You're familiar with them, though. Yes, sir. Do you understand there to be a challenge to the guideline calculations? I do. And here's what I understand that challenge to be, is that Watson objected. I can't tell you what specific prior conviction, but I know that he objected to a prior conviction. The pre-sentence report writer then amended the PSR to say, I've got the necessary court documents to prove that prior conviction. Yeah, I saw. That's why I asked. I saw that argument. It's buried under a caption that says the court erred in varying from the guidelines. So those are two different arguments. Yes, sir. I did see them as two different arguments. And I think as the general proposition is, is if the defense objects to it, it enhances. I understand. Okay. And then that leads to the substantive unreasonableness. I'll conclude my presentation. Mr. Hendricks, I note you were appointed under the Criminal Justice Act, and the court appreciates your assistance. It's my pleasure, Your Honor. Ms. Mazzanti, did I pronounce that right? Yes, Your Honor. May it please the court, my name is Stephanie Mazzanti, and I'm representing the United States in this case. Before you get going on the main issues, can we talk about the guideline calculation challenge? Yes, Your Honor. And actually, I wanted to provide a citation to the court on that point. Well, let me ask the question. My understanding is he objected to the existence of several convictions and that the court relied entirely on the PSR to overrule those convictions. And I think we have cases that say you can't do that. Yes, Your Honor, and that's the case that I was going to provide. It was not in either party's brief. Stapleton, United States v. Stapleton, 268 F. 3rd, 597. It's a 2001 opinion out of the circuit, and I came across it last night while looking at this issue. What does it say? It indicates in that situation there was a PSR statement regarding the convictions, and the court even had a colloquy back and forth with the probation officer regarding some prior convictions. And the opinion indicates that that is not sufficient to resolve that factual dispute. So are you conceding this issue? It is adverse to our position with respect to the procedural error and whether the court should have required more, so yes. So you're conceding that we need to remand on that at a minimum? I'm not, Your Honor. I'm not conceding that we need to remand on that. I'm conceding that the United States should have put forth evidence regarding that. However, no remand is necessary in this instance. Why? Because in Mr. Watson's case, his extensive criminal history, he had nine one-point criminal convictions, and the paragraph 26 and 36 convictions that he objected to were one-point convictions, and so it doesn't matter. He had, even if you disregarded those paragraph 26 and 36 convictions, you still would have had those four criminal history points counted pursuant to 4A1.1C. And so he had nine, you can only count four of them if you have one-point convictions. I see. And so it wouldn't matter. So it's harmless. It is harmless error, Your Honor, and that's why no remand is necessary. And with respect to the three-point conviction that was objected to by Mr. Watson, the objection wasn't actually that he wasn't convicted of something. It was just that I only had one conviction. I wasn't convicted of multiple things. And so with respect to that objection, the objection was not that he wasn't convicted, and he actually, in the PSR addendum, he affirmatively asserts that he went to prison for 36 months. And so there's no question that he was not convicted of something. He just said I wasn't convicted of multiple things in both paragraphs 41 and 42. I was only convicted of one thing in each case. And so that was his position. And so the error is harmless in this instance. There's no need for a remand on that point. And I think that with respect to the other issue that is kind of all within that one heading in defendant's brief, in the appellant's brief, the substantive reasonableness issue, the district court did not abuse its discretion in imposing an upward variance in this case. Here we're dealing with a defendant who has 22 paragraphs of criminal convictions, a defendant who has over 30 other paragraphs of criminal conduct. Some of that was discussed pre-trial in the government's notice. Whenever the government provided notice of its intent to offer evidence and detailed a lot of those arrest reports. And so that's also reiterated in the PSR and discussed in the PSR. His criminal history is seriously underrepresented in this case, and the district court was right to vary upward in this instance. I kind of work backwards, I guess, from that last point on appeal. There's also kind of a vague reference to the 851 enhancement. I don't think there was any citation in appellant's brief that really pressed that point, but I would just note for the record that the government submitted adequate documentation to support that 851 enhancement. It was not imposed for an inappropriate reason. I think he argues it's unconstitutional. He did pre-trial. It was overruled. We're not likely to go there. So what? We're not likely to go there. Yes, Your Honor. So with respect to working backwards, the variance issue, the argument being that there was a variance from the indictment. Here the indictment doesn't allege a specific street that the transaction occurred on. We're not required to allege a specific location in that regard beyond in our district. And so I don't think that there is an actual variance from the indictment in this case. In addition to that, Your Honor, I would point out that defense counsel, trial counsel, was well aware of where this occurred based on the discovery in the case. In the video itself, there's a discussion of going to Jordan's. It's a quick stop where the transaction ultimately occurred. I do agree that the PD's report was erroneous because they did lose sight of the confidential informant. But defense counsel was aware of it. Trial counsel was aware of it at the time. Was there cross-examination on that? Did trial counsel have an opportunity to cross-examine that officer about that error? He did. And he did have that opportunity and he did elicit some cross-examination with respect to losing the CI and not knowing that the transaction occurred at Jordan's quick stop until well after the fact. As to, we did know before indictment that the transaction occurred at Jordan's quick stop based on the CI debrief. And defense counsel had access to that report as well. It was the September 2nd report that was discussed in the transcript authored by Ed Jernigan. And so the special agent on the case was aware of where the transaction had occurred based both on the video. And that was presented to the grand jury? That would be in the grand jury transcripts? It is, Your Honor. And I checked before I wanted to represent that to the court. I did. And it was not represented to the grand jury that the transaction occurred at Maple Street. There was a discussion about going to several locations in that transcript. So that's not what the indictment was based on. The indictment was based on the actual facts in the case that were presented at trial. With respect to the sufficiency argument, here we're dealing with a case where we have a confidential informant. We have a transaction that is video recorded with multiple. Well, let's talk about what's been argued this morning by opposing counsel. You're picking all the issues that are briefed but not argued. Partly Judge Grunder asked about one, but now you go to sufficiency when the argument's been focused on the evidentiary issues. Yes, Your Honor. Okay, so I'll take the prior. Nobody's waiving an issue that isn't argued. We take it on the briefs. But I'm interested in what was argued. Yes, Your Honor. With respect to the violent conduct that was referenced in the testimony of Bobby Eflin whenever he testified, I don't think there was ever the word torture used in front of the jury. I would just say that. We gave several instances of violent conduct once it was clear that defense counsel is attacking the motivations of the officers in the case. And so we need to come back and rebut that. Why add the violent aspect? So you have to counter the, I guess, defense that he was being targeted because he had filed this lawsuit. So the court gives you an opportunity to rebut, but why do you need the violent part? Wouldn't there be something else that you could present to say, no, you are a target of an investigation for another reason, without getting into something that really wasn't part of the case itself? Well, Your Honor, the officers are bound to just be candid and truthful about it. And the reason that he was targeted is because we were targeting violent offenders in that area. Yeah, they have to be truthful. They are also supposed to limit their answers to the questions asked. So I assume on direct exam the questions elicited the testimony about violent conduct. So that's the question. Why did the prosecutor feel the need to gild the lily, so to speak, in this prejudicial fashion? Well, we elicited the information regarding the specific instances of violent conduct in response to an attack on the credibility of the officer. Essentially, Mr. Watson was trying to tell the jury that the only reason he was ever targeted was because he had sued the officers and that they were improperly biased against him and had motivation. And it was challenging their credibility, and it was a rehabilitation. So did you try the case? I did, Your Honor. Were there objections to specific incidences that came in at trial? No, Your Honor. There was a conversation out of the presence of the jury with respect to the information coming in. And we asked to take a break, actually, to make sure that Lieutenant Eflin limited his testimony. And there was a discussion about making sure we limited it. We were not going to go into all 31 specific incident reports that were listed in our modus. And that's in the transcript? I believe so, Your Honor, yes. And it's after the questioning? Your Honor, after— Was this rebuttal, or was this all done in anticipation of what the defense would— This is after cross-examination when we believed that the door had been opened in order for us to present this on redirect examination of Mr. Eflin. And we took a break and actually made sure with Lieutenant Eflin that he wasn't going to go into too much detail or talk about incidents beyond what was necessary to make our point, that this was not a bias that Mr. Eflin had against the defendant. Were any of the incidents connected to drug dealing? The specific incidents that were referenced were the use of heating up at the end of a knife, as discussed by appellant's counsel, some domestic violence, and then an assault on an officer. And those were fairly vaguely described. So it wasn't, I burned the guy with a knife because he didn't pay me for the drugs I sold him type situation? Your Honor, there were some domestic violence incidents that involved drugs, but we didn't go into that level of detail. I think there was one incident where the defendant got mad. There was an incident about a blunt, a marijuana blunt, and it involved it, but we didn't go into that in front of the jury. And we limited it to what Lieutenant Eflin had personal knowledge of because we wanted to demonstrate that he was not biased against Mr. Watson because of this lawsuit. Rather, he had a legitimate reason for pursuing him as a suspect and targeting him in this federal investigation. And was the testimony that it was violent drug traffickers? Because this is a drug case, right? So there's the, I'm assuming with the CI, they're setting him up through a CI. It seems to me that if this task force was also targeting drug traffickers or violent drug traffickers? Particularly violent drug traffickers, Your Honor. There's an overlap. And in most of these cases, it is the drug task force doing the investigation. And so it's also in conjunction with the FBI. And so it was both. Obviously, there's a lot of defendants that came out of this operation. There's 140-something controlled buys done in this circumstance. And that included both buys of drugs and guns. And so we were particularly targeting repeat violent offenders that the confidential informant would bring to law enforcement and indicate we're selling drugs and he could make a buy-off of. And so that was the goal and purpose was to take violent offenders off the street. And I think the district court rightly allowed us to go to a very limited degree, considering the actual history of Mr. Watson. It was a very limited degree that we were allowed to go into about Mr. Watson's violent history in order to rebut these attacks on the credibility of the witnesses in our case. And I would point out that it's not like defense counsel raised this with one witness. Defense counsel talked about this lawsuit with the first witness, Officer Frazier, with Bobby Eflin, with the confidential source, and then again with Officer Barnett. So it was a repeated theme throughout this trial, and we only brought up the specific instances of conduct with respect to the redirect of Mr. Eflin. So we did appropriately limit that. With respect to the September 19th transaction, it is the government's position that this was intrinsic evidence. At trial, we briefed it pre-trial for the court and said, and if it's not intrinsic evidence, we think it's intrinsic evidence, but if you believe it's not, then it's at least 404B. And we gave appropriate 404B notice. On that, your brief is thin on the myriad of 404B precedents in this circuit and elsewhere, but just tell me one that's involved subsequent conduct that was held to be proper 404B evidence. Because, I mean, in the gosh knows how many 404B cases I've had over the years, I don't remember one where it was this kind of subsequent conduct. I understand the intrinsic issue, but- Yes, your Honor. Your Honor- If I have to go find it myself, I will, but I thought you might know. I'm happy to supplement the brief. I know I've read a case that indicates that you can use 404B evidence that occurred after the fact, because I've done it in the past and I've cited that in other cases. I'm sure you're right. You don't have to do a supplemental brief. Yes, your Honor. But, you know, the government's position is that it was intrinsic to the case, and we request this sentence be affirmed in this case. Thank you. Well, some things were covered that you didn't cover, so I'll give you two minutes for rebuttal. Thank you, Judge. The first position where I heard the panel going was, you're right, this was a narcotics investigation targeting specific type of offenders that have some sort of violent background. The three instances of misconduct that were introduced were not associated with that sort of investigation. I could have understood if what came in in response to have opened that door, to answer the question of how wide was it open, was this guy has a history of using guns and selling drugs at the same time. That would have been relevant and connected to that investigation. But these were three types of offenses that, unless committed on federal property, there was even no federal jurisdiction to prosecute. These were local crimes, not associated with drug trafficking, so there was no federal jurisdictional hook for which he could have been a target of. And that's really the only point I wanted to make. Unless there are any further questions, I'll conclude my presentation. Very good. One quick one. Sorry. You probably didn't have a chance to prepare a response, but do you have any response to the harmlessness argument on the guideline calculation? I can't say that I'm that familiar with it. I understood that if you knocked that prior conviction or prior convictions out, because the government, when the burden shifted to the government, it failed to prove that enhancement beyond, pardon me, by preponderance of the evidence. I don't know where that laid. I understood that the guideline range was going to be 120 months absent those prior convictions, and therefore then you have a variance leading over to the variance issue of what, an upward variance of five years, and the notion would be that can't be harmless because if you're starting that low, there's no reason for us to believe the judge would have gone that high. Thank you all. Thank you, counsel. The case has been well briefed and argued. Again, thank you for your assistance, Mr. Henrich, and we'll take it under advisement.